UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>MARIO DIAZ, et al.,<br><br>    Defendants.<br>_____/ | NO. CR. 2:07-248 WBS<br><br>MEMORANDUM AND ORDER RE:<br>MOTION TO SUPPRESS WIRETAP-<br>INTERCEPTED CALLS |

----oo0oo----

Defendants Larry Sixto Amaro, Gerardo Lopez Mora, Ernest Paul Killinger, Jason Michael Stewart Hanson, Bismark Martin Ocampo, Benjamin Santos Castro, Marco Anthony Gomez, Edward Fuentes, Richard Mendoza, David Perez Ramirez, Faustino Gonzales, Oscar Campos Padilla, Valdemar Salazar Cambunga, and Gabriel Carracheo filed this motion to suppress wiretap-intercepted calls and for a Franks[1] evidentiary hearing on the

---

[1] Franks v. Delaware, 438 U.S. 154 (1978).

1

motion.  Defendants argue that the three affidavits in support of the three motions for a wiretap are facially deficient because they fail to establish "necessity" and that the affidavits contain intentional or reckless material misstatements and omissions.  Defendants also argue that the government's authorization to monitor the third target phone ended when the government told the court in its first periodic report that it planned to disable monitoring of the phone because it was believed that Diaz would shortly dump the phone.  Defendants further argue that all evidence obtained pursuant to the three wiretap orders must be suppressed because the task force failed to abide by the court's minimization orders, and allege that the redacted portions of the Holladay affidavits related to the multi-state OCDETF investigation linked to the Diaz drug trafficking organization ("DTO") should be disclosed.

       A.   <u>Facially Deficient Affidavits</u>

           Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, allows law enforcement agencies to conduct electronic surveillance of suspected criminal activities.  "This authority is not a blank check; aside from demonstrating probable cause, <u>see</u> 18 U.S.C. § 2518(3)(a), 'the government must prove necessity' before it resorts to a wiretap." <u>United States v. Garcia-Villalba</u>, 585 F.3d 1223 (9th Cir. 2009) (quoting <u>United States v. Gonzalez, Inc.</u>, 412 F.3d 1102, 1110 (9th Cir. 2005)); <u>see</u> 18 U.S.C. § 2518(1)(c) (stating that an application for a wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be

2

unlikely to succeed if tried or to be too dangerous"). The necessity requirement "can be satisfied by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." United States v. McGuire, 307 F.3d 1192, 1196 (9th Cir. 2002) (citing United States v. Brone, 792 F.2d 1504, 1506 (9th Cir. 1986)). "The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy." United States v. Decoud, 456 F.3d 996, 1007 (9th Cir. 2006). "An 'effective case' means 'evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment.'" Garcia-Villalba, 585 F.3d at 1228 (quoting McGuire, 307 F.3d at 1198) (internal quotation marks in McGuire omitted).

Defendants argue that the three affidavits presented in support of the three wiretap applications are facially deficient in that they fail to establish the required "necessity." According to defendants, the government's stated investigative goal of dismantling the Diaz DTO and arresting all its participants and conspirators was so broad as to be impossible to accomplish and as to justify the indefinite use of wiretaps. There is no foundation for the argument--and indeed defendants present none--that large criminal organizations are immune from wiretap surveillance simply because their size makes them difficult to dismantle. See, e.g., United States v. Shryock, 342 F.3d 948, 975-76 (9th Cir. 2003) (denying motion to suppress wiretap in investigation targeting the Mexican Mafia, a group

3

with "several hundred members and an unknown number of associates"). Furthermore, the 99-page affidavit in support of the first wiretap by Special Ageng Scott Holladay ("First Holladay Aff.") stated that the present investigation was focused on the Diaz DTO--a criminal organization operating under the umbrella of the Nuestra Familia gang. While the Diaz DTO may have had many members, conspirators, and associates, the First Holladay Affidavit stated that there already was probable cause Diaz and nine other individuals were committing the subject offenses--further contradicting defendants' argument that dismantling it was an "impossible goal."

Defendants also argue that the first wiretap should not have been issued because the First Holladay Affidavit showed that ordinary investigative procedures would have likely been successful. Specifically, Nuestra Familia gang member and informant "CW-1" had previously been successful in completing two controlled methamphetamine buys and in providing the government with incriminating evidence regarding the Diaz DTO, informant "CW-2" had been successfully used in a 120-pound methamphetamine seizure, and the government was in contact with another potential informant called "ATF source." Courts have repeatedly authorized wiretaps when the government has used or was using informants and undercover agents. See McGuire, 307 F.3d 1192, 1199 (upholding a necessity finding where "[i]nfiltration alone could not determine the scope of" the conspiracy and where "[s]tandard law enforcement techniques alone could not effectively crack the conspiracy, exposing its illicit aims and acts"); Brone, 792 F.2d 1504 (upholding a necessity finding in a case with five

4

confidential informants and an undercover agent); see also United States v. Canales Gomez, 358 F.3d 1221, 1225 (9th Cir. 2004) ("[T]he mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap.") (quoting United States v. Bennett, 219 F.3d 1117, 1122 (9th Cir. 2000) (internal quotation marks omitted, substitution in Canales Gomez). The Holladay affidavit explained that additional controlled buys by CW-1 would be prohibitively expensive and that in any event CW-1 could not discover Diaz's drug sources, the ultimate destination of Diaz's drug money, or Diaz's money laundering activities. (First Holladay Aff. at 79, 83-86.) Likewise, CW-2 was a lower-level Nuestra Familia member such that CW-2 could only provide limited information regarding the Diaz DTO. Contrary to defendants' assertions, the First Holladay Affidavit also explained that ATF source would not be an appropriate informant because he[2] was currently in custody and was an illegal immigrant subject to deportation at the completion of his sentence. (Id. at 90-91.)

Defendants also argue that the government could have used pen register data obtained from Diaz's phone and phone records to identify other conspirators, build their case, and avoid the need for a wiretap. According to defendants, the First Holladay Affidavit provides nothing more than boilerplate reasons why traditional investigative techniques were not sufficient. "A full and complete statement of necessity must specify why, in the

---

[2] The court uses the masculine pronoun when discussing ATF source and any other informant simply for convenience.

particular case at hand, the[] inherent limitations [of traditional techniques] will be insufficient." United States v. Blackmon, 273 F.3d 1204, 1209 (9th Cir. 2001). While defendants are correct that analyzing Diaz's phone records may have led the government to be able to identify other members of the Diaz DTO and its conspirators, the wiretap standard is viewed in light of the government's need to obtain evidence of guilt beyond a reasonable doubt, Garcia-Villalba, 585 F.3d at 1228, and "law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap." McGuire, 307 F.3d at 1196-97. The First Holladay Affidavit provides ample case-specific detail as to why these and other traditional investigative methods could not have provided the government with the kind of evidence necessary to obtain a conviction. (See First Holladay Aff. at 89-95). The government has therefore met its burden in showing the necessity for the first wiretap.

Defendants also argue that the second wiretap should not have been issued because the supporting Holladay affidavits showed that the first wiretap had been successful in identifying some members of the Diaz DTO conspiracy and in obtaining incriminating evidence. In the 48-page Holladay Affidavit accompanying the second application for a wiretap ("Second Holladay Aff."), Holladay stated that the government now had probable cause that eighteen individuals were engaged in the subject offenses and had identified two of Diaz's drug suppliers. (Second Holladay Aff. at 5.) According to defendants, this success meant that further wiretap surveillance was no longer necessary. The goal of the investigation, however, was to

dismantle the <u>entire</u> Diaz DTO and its conspirators.  And as explained above, necessity is determined by the government's need to obtain evidence of guilt beyond a reasonable doubt.  <u>See</u> <u>Garcia-Villalba</u>, 585 F.3d at 1228.  The Second Holladay Affidavit stated that there were additional conspirators and drug suppliers to the Diaz DTO that remained to be identified.  (<u>Id.</u> at 28.) While the first wiretap may have aided the investigation, its partial success does not negate the necessity for additional wiretap surveillance.  <u>See</u> <u>Canales Gomez</u>, 358 F.3d at 1225.

          Defendants also argue that the government could have used a new source identified as "ATF-2" as an informant rather than seeking further wiretap surveillance.  Yet ATF-2 was then in custody pending state charges so he could not have been used at that time as an informant.  (Second Holladay Aff. at 38.)  Even if he could have been used, there was no evidence that he could have uncovered all of Diaz's suppliers of narcotics or any of his money laundering operations.  <u>See</u> <u>McGuire</u>, 307 F.3d at 1196-99. Finally, defendants make the conclusory argument that the Second Holladay Affidavit discounts the potential success of traditional investigative techniques in boilerplate language.  Viewing the affidavit as a whole, it adequately provides case-specific information regarding the past shortfalls and predicted likelihood of low success of traditional investigative techniques.  (<u>See</u> Second Holladay Aff. at 29-44.)

          Defendants challenge the third wiretap on the same grounds.  For the reasons previously discussed, the court finds sthe affidavit in support of the third wiretap application sufficient.

7

1          B.    Material Misstatements and Omissions

2          The Fourth Amendment requires an evidentiary hearing at a defendant's request "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." Franks, 438 U.S. at 155-56.  Defendants request such a hearing for seven types of material misstatements and omissions in the Holladay affidavits.  First, argue that the Holladay affidavits misled the court about CW-1's criminal history because it did not detail every item on his rap sheet.  The First Holladay Affidavit informed the court that, among other things, CW-1 "has suffered felony convictions for willfully discharging a firearm in a negligent manner and being a felon in possession of a firearm.  (First Holladay Aff. at 25.)  While the affidavit did not inform the court of a 1993 misdemeanor for obstructing a peace officer, a second conviction for a felon in possession of a firearm, or a 2007 DUI arrest and subsequent plea to reckless driving, the court was well aware that CW-1 was a convicted felon "involving various crimes of violence and drug-related offenses" and member of the Nuestra Familia gang.  (First Holladay Aff. at 25.)  These omissions, therefore, were not material and did not mislead the court as to CW-1's reliability as an informant.

          Second, defendants argue that the First Holladay Affidavit misled the court in suggesting a connection between the Diaz DTO and the Sarabia seizure of 120 pounds of methamphetamine.  The affidavit outlines the Sarabia seizure, CW-

2's role in it, and states that unrecorded telephone conversations between Diaz and CW-1 after Sarabia's arrest that "may indicate a connection between the DIAZ DTO and SARABIA'S large-scale drug operation." (First Holladay Aff. at 56-58.) The affidavit makes clear that "[i]t is not clear what link, if any, the DIAZ DTO has to the SARABIA'S large-scale drug trafficking." (Id. at 59.) The court was therefore not misled as to any potential link between the Diaz DTO and the Sarabia drug seizure.

The affidavit also outlines an unrecorded telephone call between CW-1 and Diaz that Holladay believed was regarding the Sarabia arrest and seizure. (Id. at 58-59.) Defendants argue that this phone call never happened, that Holladay's statements regarding the call are false, and that there was no evidence of any link between the Diaz DTO and Sarabia's drug trafficking operation. Even if the Holladay affidavit were purged of these statements, the 99-page affidavit still amply supports a finding of probable cause and necessity for the wiretap. See United States v. Meling, 47 F.3d 1546, 1554 (9th Cir. 1995) ("[I]f, when material that is subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.") (quoting Franks, 438 U.S. at 171-72) (internal quotation marks omitted, substitution in Meling). Because the court was not misled that any connection between Sarabia and the Diaz DTO was speculative, the wiretap did not rely on any supposed connection between the two criminal operations.

          Third, defendants argue that the First Holladay Affidavit misled the court by failing to include a summary of a March 6, 2007 telephone call between CW-1 and Diaz in which CW-1 arranged to purchase two pounds of methamphetamine from Diaz, and the Task Force's subsequent cancelling of the order for lack of funds.  The affidavit made clear that additional controlled buys by CW-1 would not uncover Diaz's suppliers or the origin and method of Diaz's money laundering scheme.  The court has already explained why this showing satisfies the necessity requirement for a wiretap.  Any additional evidence that CW-1 could have engaged in an additional controlled buy is therefore not material.

          Fourth, defendants argue that the First Holladay Affidavit omitted material information told by Diaz to CW-1 regarding the Diaz DTO's Sacramento drug operation.  Specifically, that Nuestra Familia's leader in Sacramento had been arrested and the Diaz DTO had possibly stopped distributing drugs in Sacramento as they could not identify and contact the Nuestra Familia members in Sacramento.  The Diaz DTO is a complex organization that supplies drugs all over Northern California and supplied San Francisco with over thirty pounds of methamphetamine a week--ten times more than was then supplied to Sacramento.  (See First Holladay Aff. at 38.)  Even assuming defendants are correct and shipments to Sacramento halted for a period of time, the inclusion of this information would not have resulted in the court finding the affidavit lacked probable cause for the wiretap.

          Fifth, defendants argue that the Holladay affidavits

10

1  mislead the court regarding the Diaz DTO's relationship with
2  Fidel Castro, who was then the subject of an Organized Crime Drug
3  Enforcement Task Force ("OCDETF") investigation in Bakersfield.
4  Specifically, defendants argue that the First Holladay
5  Affidavit's conclusion that "[i]t is unknown at this time whether
6  DIAZ and CASTRO were involved in activity relating to the
7  trafficking of narcotics or carrying out duties relating to the
8  business of GEEZ clothing" was intended to mislead the court.
9  See Id. at 65. Yet defendants acknowledge that the First Holladay
10 Affidavit outlines the known contacts between Castro and Diaz,
11 both of whom own Geez Clothing stores, including Diaz's use of
12 coded language believed to be referring to sending drugs to
13 Castro.  (See id. at 63-65.)  Indeed, Agent Holladay specifically
14 stated that "I believe this overheard conversation may be DIAZ
15 discussing a shipment of narcotics to CASTRO in Bakersfield."
16 (Id. at 64.)

17        The affidavit makes clear that both Diaz and Castro
18 were believed to be engaged in the sale of narcotics; it
19 carefully notes, however, that both Castro and Diaz are involved
20 in other business ventures that could explain any link between
21 them.  Any omitted information confirming that Castro was
22 involved in drug activity would not change this conclusion.  Nor
23 would information that Castro had been to Diaz's Geez clothing
24 store.  The court therefore was not misled as to the potential
25 drug connection between Diaz and Castro.

26        Sixth, defendants argue that the affidavits should have
27 disclosed that the Task Force had obtained pen registers and
28 other telephone records for Amaro, Killinger, and Villalpando's

11

telephones.  The failure to do so, according to defendants, was part of an effort to mislead the court about the efficacy of traditional investigative techniques.  The phone records for Larry Amaro are dated six months before the first Diaz wiretap application, the Killinger records were ongoing before and during the Diaz wiretap applications, and the Villalpando records were obtained before the second wiretap application.  Even if the court were aware of these pen registers and other telephone records, there was still "a substantial basis for concluding that probable cause existed."  Meling, 47 F.3d at 1554.  The government adequately explained the limitations of such investigative methods, and the fact that the government had used such methods to a greater extent than disclosed would not have undermined probable cause for a wiretap.

Seventh, defendants argue that the affidavits omitted information that CW-1 brought an associate with him to some meetings with Diaz.  In their Reply, defendants argue that this information refutes Holladay's assertions that the Diaz DTO is a secretive organization and that other informants would not be able to access Diaz or other Diaz DTO members.  The First Holladay Affidavit explained, however, that CW-1 could not uncover Diaz's suppliers or information regarding the Diaz DTO's money laundering operations.  Including this omitted information in the Affidavit would not have changed this conclusion nor would it have eviscerated the government's "necessity" or probable cause for the wiretap.

Because none of the government's alleged misstatements or omissions were necessary for probable cause, defendants have

12

1 failed to meet their burden necessary to call for a <u>Franks</u>
2 evidentiary hearing.
3    C.   <u>First Periodic Report for Third Wiretap Terminated</u>
4         <u>Government Authorization</u>
5         Defendants argue in the alternative that all calls
6 obtained on Target phone 3 after May 14, 2007 should be
7 suppressed because the government's First Periodic Report stated
8 that the government intended to dismantle the wiretap on May 10,
9 2007.  The court granted a third wiretap application on April 30,
10 2007, and the government filed its First Periodic Report on May
11 14, 2007.  The Report provided detailed information about the
12 narcotics-related telephone calls intercepted, and stated that
13 Diaz had discontinued use of Target phone 3 after May 7, 2007 and
14 there were no calls through May 9, 2007.  (First Periodic Report,
15 at 20.)  The report stated that the FBI intended to disable the
16 monitoring equipment on May 10, 2007.  (<u>Id.</u>)  The government
17 filed its Second Periodic Report on May 21, 2007, which stated
18 that there were no calls placed or intercepted between May 7
19 through May 12 but that criminal activity resumed shortly after
20 the filing of the First Periodic Report.  (Second Periodic
21 Report, at 4.)  According to the Second Periodic Report, Target
22 phone 3 was now believed to be a pre-paid cell phone whose
23 minutes had expired during the period of inactivity.  (<u>Id.</u>)  The
24 FBI resumed monitoring Target phone 3 on May 14, 2007 after the
25 monitoring equipment showed Diaz resumed using the phone on May
26 12, 2007.  (<u>Id.</u>)
27         The wiretap on Target phone 3 was authorized on April
28 30, 2007 for a period of thirty days.  (April 30, 2007 Order.)

The court, in its discretion, directed the government to provide the court with a periodic report on the tenth and twentieth days showing what progress had been made toward achieving the authorized objectives and need for continued interception. (April 30, 2007 Order, at 8); see 18 U.S.C. § 2518(6). The court signed the First Periodic Report, stating that it had been reviewed by the court and ordering it sealed. (First Periodic Report, at 21.) Contrary to defendants' assertion, the First Periodic Report did not eviscerate or modify the court's Order granting a thirty-day wiretap, nor did the court make any other ruling that the wiretap was no longer necessary

   D. <u>Failure To Abide by Minimization Orders</u>

   Defendants also argue that the evidence obtained pursuant to the three wiretaps should be suppressed because the government failed to abide by the court's minimization orders. Defendants cite the call data provided in the first and second periodic reports for the three wiretaps as evidence that the government minimized only a small number of calls and intercepted a large number of calls deemed not pertinent. The government responded to this argument in a supplemental brief filed on July 27, 2010 (Docket No. 616), to which the defendants did not reply.

   Title III requires that wiretapping or electronic surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5); <u>Scott v. United States</u>, 436 U.S. 128, 130 (1978). Minimization "requires that the government adopt reasonable measures to reduce to a practical minimum the interception of conversations unrelated to

14

the criminal activity under investigation while permitting the government to pursue legitimate investigation." United States v. McGuire, 307 F.3d 1192, 1199 (9th Cir. 2002); see United States v. Torres, 908 F.2d 1417, 1423 (9th Cir. 1990); United States v. Santora, 600 F.2d 1317, 1320 (9th Cir. 1979) (amended on other grounds).  The Supreme Court "has stressed that, because of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law that will decide every case." McGuire, 307 F.3d at 1199 (quoting Scott v. United States, 436 U.S. 128, 139 (1978)) (internal quotation marks omitted).

The Supreme Court has made clear that "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to" determining whether "their interception was still reasonable." Scott, 436 U.S. at 140.  Instead, courts determining whether the government complied with the statutory requirement to minimize wiretap surveillance must "examin[e] the monitoring officers' conduct in light of the particular circumstances of the case." McGuire, 307 F.3d at 1199-1200 (citing Scott, 436 U.S. at 140); see United States v. Homick, 964 F.2d 899, 903 (9th Cir. 1992).  Defendants do not argue that any particular call or calls were improperly intercepted.  Rather, they simply argue that the numbers speak for themselves and that the government failed to meet its burden simply because it minimized a small number of nonpertinent calls.  This argument is at odds with Scott and McGuire, which make clear that a court must not simply look at the numbers but must examine the circumstances of the case to determine whether minimization was

15

1 sufficient.

2 Each of the three orders authorizing wiretap 3 interceptions ordered that the "monitoring of communications [] 4 be conducted in such a way as to minimize the interception and 5 disclosure of the communications intercepted to those 6 communications relevant to the pending investigation" and 7 detailed the circumstances under which monitoring of a particular 8 conversation must be terminated.  See 18 U.S.C. § 2518(5). 9 Defendants do not argue that the government's minimization 10 procedures were insufficient.  Indeed, the government provided 11 call monitors with a detailed list of instructions, which 12 required monitors to, inter alia, read the Application, 13 Affidavit, and Order authorizing the wiretap, keep detailed 14 records of the calls monitored, and minimize the number of 15 nonpertinent calls intercepted.  (See Supp. Opp'n (Docket No. 16 616) Ex. E.)  The periodic reports for the three wiretaps also 17 provided information regarding the government's surveillance 18 training for monitors.  (See id. at 5-6 (outlining the 19 government's minimization compliance procedures).)

20 In response to the court's concern at oral argument 21 regarding the types of calls included as "nonpertinent" in the 22 periodic reports for the three wiretaps, the government clarified 23 the data in its supplemental opposition brief.  (Supp. Opp'n Ex. 24 D.)  While the numbers cited by defendants in their motion appear 25 to show only a very small percentage of nonpertinent calls as 26 minimized, the data in the periodic report does not account for 27 calls that were not completed or connected, dropped calls, and 28 calls where there was no audio file.  (Id. at 10 & Ex. D.)  This

16

substantially modifies the number of "completed" calls in the first wiretap.  Furthermore, the overwhelming majority of intercepted calls lasted under two minutes.  (Id. Ex. D.)  In the case of very short calls, "involving a wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." Scott, 436 U.S. at 142 (discussing calls lasting less than ninety seconds).  Given the government's comprehensive minimization procedures and that a complex conspiracy was the target of the surveillance, the court cannot say based on numbers alone that the agents acted unreasonably when they intercepted these calls.

With respect to calls over two minutes in length, the government minimized over forty percent of such calls for the first wiretap and minimized over thirteen percent for the third wiretap.  (Supp. Opp'n Ex. D.)  The second wiretap monitored a "push to talk" telephone that communicates via individual one-way transmissions which makes minimization more difficult, and only one call out of thirty-nine calls longer than two minutes were minimized.  (Id.; see id. at 10-11.)  Surveillance involving a widespread conspiracy or guarded or coded language, however, warrants "latitude to scrutinize messages by conspirators, because such messages may contain double-meanings and implied purposes, or even be conveyed in secret code."  McGuire, 307 F.3d at 1201; see Scott, 436 U.S. at 140 ("Many of the nonpertinent calls may have been very short.  Others may have been one-time only calls.  Still other calls may have been ambiguous in nature or apparently involved guarded or coded language.  In all these

17

circumstances agents can hardly be expected to know that the calls are not pertinent prior to their termination."). The Holladay affidavits repeatedly explained the use of coded language by Diaz and other conspirators when discussing narcotics, money, and other conspirators involved in the subject offenses, and latitude should therefore be accorded to the government's minimization efforts.

The sole fact that the government did not minimize a larger number of nonpertinent calls does not mean that it failed to meet its duty to minimize such calls.

IT IS THEREFORE ORDERED that defendants' motion to suppress the wiretap intercepts be, and the same hereby is, DENIED.

DATED:   August 31, 2010

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE